191383 Union of Concerned Scientists et al. v. U.S. Environmental Protection Agency et al. I'm sorry, um, Mr. Shelf. Thank you. May it please the Court, Zach Schauff for Appellant's Union of Concerned Scientists and Dr. Leanne Shepard. I'd like to reserve four minutes for rebuttal. So in October 2017, EPA broke with decades of practice from across the federal government by deeming receipt of grant from the EPA a conflict of interest that precluded service on EPA's scientific advisory committees. When it did that, it excluded more than 8,000 leading academic and nonprofit scientists from service on these committees where they have long held EPA's feet to the fire by ensuring that the EPA relied on the best available science as Congress intended. So we contend that the directive violated the Administrative Procedure Act and the Federal Advisory Committee Act. And we also submit that the district court erred by dismissing our claims on the ground that compliance with these statutes was committed to agency discretion by law. And I plan to talk about our APA claims and our FACA claims in turn, but before I delve into the doctrine, I just want to give our sort of common sense pitch on why these claims are justiciable. One, the statutes we invoke are mandatory and respecting Congress's intent means enforcing them. Second, Congress did not use the language it employs to limit judicial review or commit these matters to agency's absolute discretion in the manner that it did in, for example, the Webster V. Doe case. And third, whatever you think on the merits, we submit that the sort of merits arguments you see here are the kind that the courts resolve in APA cases every day. So going to our APA claim, it's really a run-of-the-mill one. It's that the agency did not adequately explain its course of action and departed from its policies without adequate explanation. And just last summer, the Supreme Court in the Department of Commerce case underscored just how strong the presumption of reviewability is for APA claims like this one. It explained that the exception that the government relies on here for actions committed to agency discretion by law is generally limited to categories of traditionally non-reviewable actions, like non-enforcement decisions, like allocations from lump sum appropriations, and there's no dispute that we are not in that universe here. What does the term sole discretion of the appointing or inviting authority mean in this case? So I think you're referring to the part of FACA that says. So what that provision of FACA is limited by other applicable law. So unless other law provides a limit, then the administrator does have discretion. But here we've identified a bunch of statutes that we think impose limits. And let me just sort of run through them. One is the substantive statutes that EPA administers, many of which require the EPA to rely on the best available science, the latest science, or similar. So this includes the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, and the Toxic Substances Control Act. FACA itself says its requirements, quote, shall be followed by agencies, including the ones we invoke here, requiring that committees be fairly balanced with respect to the function they perform and the points of view represented. Then there are the additional substantive statutes creating and requiring EPA to seek guidance from these advisory committees. So all of those limit the EPA's discretion. And what we think of the Department of Commerce case shows is that it is at least sufficient to review sort of core reasoned decision-making claims, like we have here, that there be statutes like this in the neighborhood that constrain the agency's discretion at least to some degree. When that's so, the agency must comply with the sort of core reasoned decision-making requirements of explaining itself, justifying departure from precedence, and the like. Meanwhile, on the other side, if EPA has its way in this case, it really is open season. You can sort of pick your horrible example of a policy they could adopt, fire everybody from these committees, and enact a rule that says if you're on a committee addressing air pollution, you must have worked for a coal company. And all of that would be non-reviewable. We submit that is not the law and shouldn't become the law. Wait a minute. What about the fairly balanced viewpoints? How does the EPA reach the conclusion that the committee is fairly represented in viewpoints? So two categories of answers there, Your Honor. One, we don't think you actually need to reach the sort of viewpoint question to hold the directive here unlawful, because what FACA also requires is that agencies be fairly balanced with respect to the function performed. And our view is that the directive systematically skews the EPA's advisory committees away from the best available science, which is the function they perform, by needlessly excluding thousands of the most qualified academic and nonprofit scientists. What's your second reason? So the second reason is that even if you thought you needed to look at points of view, there's no problem with doing so, and that's for a couple reasons. One, if you agree with us that this directive imposes an unjustified burden on academic and nonprofit scientists, you don't really need to reach the question of what are the sort of full universe of points of view that might be relevant. It imposes an unjustified burden on these viewpoints, and that's enough. Now, the EPA also says that it's sort of, who knows whether academic, nonprofit, industry are the sort of relevant viewpoints. But I submit that that objection is, you know, frankly a little made up, and the way to see that is to look at the Office of Inspector General report that EPA points to in its response brief, where if you look at the categories they use to identify the members of these committees, those categories are, one, academics, two, nongovernmental organizations, three, industry, and four, consultants, which we would submit as basically saying it's industry. So we are using the very same categories that EPA uses. Counsel, perhaps you'd like to let the judges ask you some questions about your position? Judge Kayada has... Yes, what you say, as I understand, one of the points EPA is making is that Congress specifically told EPA to guide against inappropriate influence by the EPA itself on its committee. And so as I understand the rationale, they're saying, well, people who look to us for grants are going to want to curry favor with us, so they shouldn't be on the committee because that would be an indirect mechanism of bringing to bear inappropriate influence by the agency. So they say, so there you go, there's one of our reasons, and you may like it, you may not, but that's why we're the EPA and you're not, we get to pick a reason. How do you respond to that? So I think the core response is that, you know, the one thing EPA, of course, never set out below, and the Chenard Doctrine says that you can't justify... Actually, never mind, they did say that below. The core response really is you still need to consider whether there's a genuine risk of inappropriate influence here, and in this case, EPA, the Office of Management and Budget, and the Office of Government Ethics have all looked at this over a period of decades and have come to the opposite conclusion, and they've done it for a reason. The reason they've given is that when you have grants awarded through an investigator-initiated, peer-reviewed process, it creates a buffer between the agency and the scientist that limits the ability of the agency to exercise... Let me stop you. I think you're making two different arguments. One is that the EPA's position does not exclude the possibility of undue influence by others in the mix. It may be concerned about undue influence on the EPA, but by its actions it is causing undue influence by others, so it is deficient in that way. The second argument is nobody before this point has ever thought that the mere acceptance of a grant is itself a challenge to the independence of the EPA, and EPA has not adequately explained why that is so. Am I correct? That's right, and I do want to amplify the first point you made. Okay. There are some other questions. We have a limit on time. I'm far from clear about the fact... Well, we do not have an administrative record in this case, and normally you don't answer EPA questions on the merits as opposed to the motion to dismiss without having such a record. Now, the EPA says go ahead and affirm the dismissal. You don't need a record for that, but I do not view the EPA as saying if you're thinking of a reversal, you don't need the record for that. Your position seems to be, oh, if the EPA says you don't need a record, well, we'll agree with that, except there is a far more cabined explanation of why they think a record isn't needed. I thought that you were arguing that you need a record so you know whether it is a complete record, and you need a record because you have some arguments about bad faith and pretexts that might be useful. And that might entitle you to other discovery. So I think that is our position. We do think you can reach the merits. Which is your position? So our position, just to be very clear, is that we think you can reach the merits and reverse because the EPA has told you in its brief you have everything necessary to evaluate the rationality of the directive, and there is nothing else in the directive and the memorandum and the administrative record that would help them with that. Our view is that there is additional facts that if you don't agree with us on that point, we would like to and be entitled to develop. The only thing we have before us is a motion to dismiss. That's true. The EPA has agreed. If that is an error, wouldn't normally the matter go back to the district court for further proceedings? Absolutely. And we think that would be well within the court's discretion. It's not a matter of discretion. It is what we as an appellate court are required to do. I understand. I think the basis for going further would be that they had pointed you towards what is basically the summary judgment record in other cases. And if you don't agree with us, I do just want to give the reason why we think a remand is warranted. No, I would like to know why you didn't file the administrative record with us. Why we didn't file the administrative record? Because you're the challenger. It's on the agency to file and certify the administrative record. I don't think we would actually be able to do that. They say it was made available in two different court cases and you had access to it. We didn't have access to it. We didn't actually know that that's what they would have filed in our case. And you didn't want to be in the position of certifying that that was the actual record? Sure. Because they had made arguments in our case that I think would justify an expanded record. Our view of the FACA claim, for example, is that because... And the district court never reached those issues because of its ruling on the motion to dismiss. And you seriously want an appellate court to reach those issues in your favor? We would ask that on the APA ground, not on FACA. But if the court is not inclined to do so, that is, of course, fine with us also. Your counts confuse me some. There's count one, which seems to be a pure APA, and then the FACA counts are applied as separate counts. Do you mean to suggest that we could decide under the APA in your favor without any reference to FACA? That's correct. We think that you could decide the sort of reasoned decision-making aspects of our claim that the directive and the memorandum don't accurately explain in EPA's course and it failed to justify its departure from its long-standing policy without reference to the FACA claim. As compared to what? In other words, they say what they're doing. Sometimes something's obvious depending on what the standards are. Sometimes it isn't. You need to have some sense of some standards, don't you? Well, I think if you look at the directive and memorandum itself, what you'll see is that there's no explanation of why receipt of these agency grants... I would have thought you would have wanted your APA case to turn on all of the standards that you articulate in your FACA claim, including FACA itself, including the statutes that require these advisory committees to be set up that specify what has to be done by these advisory committees, by the other federal regulatory requirements. Why wouldn't you want that to be part of your APA case? This may just be a matter of inarticulate pleading, but the way we conceive of these claims anyway is that our APA claim is basic reasoned decision-making, and you might look to a bunch of statutes, including FACA, to determine whether that's justiciable in the way that the Supreme Court did in the Department of Commerce case. Well, are we required to? The question is, are you required to find an underlying substantive statute? No, no, no. It is, I would have thought, in your interest that we refer to the underlying statutes, not whether we are required to do so or not. Have I misperceived something? I don't think you have. We do rely on those statutes for the sort of justiciability of count one. But even your claim, I mean, imagine that we're no FACA, and they just said to increase independence of membership on the agency, we're going to be extra careful and people who get grants from us can't be on the committees. How would you say that's irrational or not sufficiently explained, unless you could point to something like FACA and say, well, but they're supposed to try to have some fair balance here? So the first thing I'd point you to is the place I started before, which is the substantive statutes EPA administers requiring EPA to use the best available science, the latest science, and it is arbitrary and capricious under those statutes to not consider the harm that the directive inflicts. I understand you've just conceded the point that we've been trying to make, which is that even your APA claim involves reference to the other substantive statutes. So, I mean, our fallback argument, which we do have, is that you don't really need to look to any underlying substantive statute because we are not in the category of traditionally knowledgeable action. It's a fallback argument. It may not be in your best interest to be making that. I just have a factual question. This directive came in late 2017, October 31. The lawsuit is filed three months later. The district court decision is more than a year later. Then it comes up and at least you've got an oral argument more quickly here. But a lot of time has passed and a lot of appointments have been made to these committees. How many people are there on these committees and are there presently any vacancies on any of these committees? So the number of people varies pretty widely. I know. You say there are 22 committees. You should know the number of people on those 22 committees. Do you have an answer? So for the board of scientific... No, no, the total. Total across committees? No, I don't know that. The reason, though, is that our claim focuses on the directive itself. And the idea behind our claim is that... You're seeking declaratory relief. You are seeking injunctive relief. Both of those are pled in your complaint. I'd sort of like to know where we are in this process. So, you know, I think what... Two points. One, the fact that the directive puts a thumb on the scales against academic and non-profit scientists, we think, you know, is what basically renders it invalid. Without respect to the numbers... Stephanie, I mean, there's a difference between putting a thumb on one side of the scale and putting a truck on that side of the scale. I think what we're trying to get at here is how do we tell from this record whether there's a thumb that in the long run is inconsequential because there are plenty of other people to serve on the committees anyhow, or it's a truck because the 8,000 essentially wipes out one whole side of the... So let me echo this to Judge Lynch's practical question of what's happened with this in the year and no one's telling us. So let me answer it in sort of two parts. One is that the core of our EPA claim is that the EPA never looked at the effects at all, and that's what renders the directive... Counsel, thank you, but that's not a helpful response. So the second point is that if you look at, for example, the record that EPA has filed... That isn't your response that you would want it to go back to the district court so that both sides have the opportunity to present some evidence about all of this and that because it was decided on motion to dismiss, no such opportunity was available to you. We would be very happy for that. I do want to point you to two things that are before this court. One is the GAO report, Inspector General report, cited page 25 of our reply brief that shows the very large effects that the directive is having. On the Board of Scientific Counselors, for example, the percentage of academics has dropped from 65% to 20%. And we also know from the administrative record filed in other cases that this sort of effect was foreseeable just before the directive issued. EPA had before it evidence that six of the seven members of the CASAC committee and 22 of 26 members of the particulate matter subcommittee had EPA grants. So they knew this was going to have a massive effect of excluding people who they otherwise deemed qualified and did not even consider that. Okay. Thank you. Thank you, Your Honor. Good morning, Mr. Sandberg. Good morning. May it please the Court. Jeff Sandberg for the United States. The district court correctly concluded that there was no legal basis to set aside the policy at issue here. All agencies have priorities and policies for staffing their advisory committees. Most of them don't write them down and then announce them publicly. EPA did so here. And the agency action did challenge that. So why didn't you file the administrative record in this case? We didn't file it because the court instructed us that we didn't need to file it because it was prepared to rule on our motion to dismiss on the justiciability arguments without the record having been filed. Is this in some conference or hearing before? There had been – so we filed our motion to dismiss. The plaintiffs filed a motion to compel production of the administrative record. The district court denied that motion without prejudice, saying I don't need the record right now to rule on threshold questions of ripeness, justiciability, standing. And the court indicated that if it were going to undertake a merits inquiry that it thought it needed the record for, it would revisit that question of whether to compel production of the record. Okay. Thank you. That's very helpful. So the agency action here, I want to emphasize, really couldn't be more discretionary and internal in nature. It is a voluntarily issued policy statement regarding how the agency intends to exercise its discretion in choosing future members for the agency's own advisory committees. And those committees exist solely to provide advice to the agency. They don't promulgate regulations. They don't adjudicate cases. They don't do anything that would remotely resemble filing a case. Yes, but they exist by virtue – well, at least eight of them do – by virtue of an express command from Congress, which used the word shall. And there's no indication from that legislation that Congress intended this to be committed to agency discretion, to use the APA language. Well, the question whether Congress expressly intended to cut off review is a 701A1 question. 701A2 committee agency discretion, as the Supreme Court has told us, requires us to look to two things. One, does the substantive statute that Congress enacted, whether it uses the word shall or not, provide judicially administrable standards for deciding what is legal and what is not legal? Okay, so let's turn this around. I'd like to ask you a question. Go ahead. How do you decide what standards? Is it written how you pick the members of these committees? There are charters for each of the committees. You can find them in the joint appendix that provide general guidance as to how the agency intends to staff them. There are also – each time that a committee comes up to be staffed with one of their vacancies, there's a notice published in the Federal Register that says, here are particular areas of interest of what the agency is looking for for these committees, you know, experts in biostatistics, atmosphere, chemistry, epidemiology, medicine, a long list of things. How do you pick – have you asked members of the committee that they were not qualified? Have you indicated that to particular members? I'm sorry, Your Honor is asking if all of the members are currently qualified? No. Did, as a result of this directive, you say to members on committees, you are no longer qualified? I believe that was the question. Yes, yes. There were some members who, while they weren't told they weren't qualified, they were told you can either retain your EPA grants or you can serve on the committees. Our policy now is you can't do both. Some chose to resign from the committees. Some, like Dr. Shepard, who is a plaintiff in this case, chose to remain on the committee. So I would not say that they were not qualified anymore. And there is a record of communications with various people informing them that they have to make this choice? Those communications were made. I don't know that they're in the Joint Appendix. Were they made in writing? Many of them were by email, yes. Okay, so your agency should have in its records those communications. But no one is disputing that the policy has been applied to them. What they're trying to challenge here is the notion that an agency can set priorities to enhance the independence. They are saying if you look at the effects of this policy, when you look at what has actually happened, it is causing at least arguably a violation of the statutory mandate. So I'd like to go back to an earlier question I had for you in which you said, and I said, look, Congress said these advisory committees shall exist and they shall perform these functions, and FARA has certain requirements of fair balance as to function and viewpoint and independence. All right. So if you look at all of that and you're doubtful, you draw a conclusion that you're doubtful that this is committed to agency discretion, you replied to me that, well, there's no meaningful standard of judicial review. That's one of the factors. Yes. In fairness, you said there were several, and that's your first one, but suppose one draws the conclusion that it is not committed to agency discretion entirely. It may depend on the facts of the given case. Nobody is saying the appointment of a particular individual violated anything. This is instead a facial attack based on the effects of a policy. All right. So let's assume that one thinks that this is not committed to agency discretion. Does it follow from that that there are judicially manageable standards, at least in a case like this? That's the other side of the coin. In deciding that it's not committed to agency discretion, you'd have to decide that there is some particular standard you could apply. Let me distinguish between two types of claims that you might imagine being brought in these circumstances. One is the parade of horribles type claim that isn't brought in this case but which my opposing colleague referred to where only coal industry executives are serving on a committee. In such a case, you might say, look, there's been no balance at all. Forget about whether something is fairly or unfairly balanced. There's no balance at all. And in that situation, I'm not conceding it, but a court might say, look, I think I can decide the on-off switch of whether some effort was made to balance the committee at all. But here we're talking the plaintiffs themselves have said their claim in this case is that the committees have been balanced in an unfair manner. Still today, there are more academic scientists than industry scientists across EPA scientific committees. You can find that by going onto the FACA database, which is a matter of public record. You can see every advisory committee member who's serving on every EPA committee right now. And, yes, there are fewer academic scientists than there used to be, but the EPA has struck a slightly different balance. Different administrations do that. This goes precisely to the thumb-in-the-truck example I was using before. Clearly the EPA has done something, made a change here. It seems to be a fairly large change. 8,000 individuals who otherwise would have been qualified to sit on these committees and provide their expertise are no longer. You would like to think that you would find in the record some indication that EPA considered what the effect of that would be on the balance of the committees and what the effect would be on the mission of the committees. And instead we seem to just have a fiat. Here this group is no longer on the committee. Agencies get to decide what their priorities are for stepping their committees. Sure, but they're also supposed to show us that, in words, let's assume that they just knocked off all these people and they didn't give any consideration to the effect of the balance of the committees. Well, as Judge Torian pointed out before, by regulation everyone serves on these committees. I never had a chance to point out anything yet. As you asked before, there is a regulation that says that everyone serves at the pleasure of the administrator. If the administrator wanted to remove these people for some other reason, the administrator could have done so. Let me ask it this way. Is there anything in the record that you can point us to that would show that in deciding before knocking off these 8,000 people, the EPA turned its attention to what the effect of that would be on its ability to balance the committees and on the mission, the ability of the committees to achieve their mission? I think so, Your Honor. Tell me where that is in the record. Read me the sentence. I think it would make sense to look through the administrative record that was filed in the SDNY litigation, which my opposing colleague has cited repeatedly in his reply brief. It's not in front of us. Okay, it was cited in the reply brief repeatedly by my colleague. To the extent you consider his arguments, I would ask that you go to the source where you will see that the House of Representatives twice passed a bill that would have taken even more aggressive measures against EPA committee service. Perhaps Judge Keada could finish asking the questions he started to ask. Go ahead. Keep going. Our brief pointed out one example in the explanatory statement where Congress said take a close look at this. The court should be aware that the House of Representatives twice voted to pass a bill that would have required that the science advisory board of the EPA not have any members on the advisory committee who currently have grants or that will apply for grants in the next three years. Let's put it this way. Suppose the EPA tomorrow said we're rescinding that and we're putting in a new position that says no one who's in any way associated with any regulated industry can be on any of our committees because if they receive any money from an industry, they may be biased. I would expect there would be an argument that would say, hey, the effect of that can be a huge debalancing of the committee views. You've got to at least show you looked at that before you do it. And then unless I'm wrong on that, I'm having trouble seeing exactly how this would be fundamentally different, not in the end result but in the process that should be applied. Here the claim is that there's something unlawful in balancing the committees with slightly fewer academic scientists and slightly more industry scientists or in the drawn-from-a-population of academic scientists of people who are currently not receiving grants. Where do you get the word slightly from in this record? I don't. I'm relying in part on the GAO report which was cited in our briefs from 2000 and referring to data as of 2018. I'm referring to information that's available on federal advisory committees. EPA has made a judgment. That makes me feel better. EPA has made a judgment that eliminating these 8,000 will only have a slight impact on its ability to balance. Is that what you're saying? That's right. Where in the record do I find that EPA made that assessment? It's not in the record because we submit that this court shouldn't be in the business of deciding whether agencies have come up with good priorities or not. Everyone can fight about the composition of the committees later down the road. Can we decide whether you've acted arbitrarily and capriciously? No, not for matters that are in the agency's discretion at all. Did the APA provide you actions? As a screen reader told us, as the text of the APA tells us, you have to clear the 701A2 hurdle before you get to Section 706. There's one really basic point I want to get out. Excuse me. I would like to ask you a question. I would like to know the standard that you use for eliminating those 8,000 scientists. What did you base your decision on? That goes exactly to what I was about to say, Your Honor, which is that these committees are not just about providing expert science. They're about providing and being seen as providing independent science. Everyone should remember EPA has its own scientists conducting research, performing studies. So you concluded that those 8,000 scientists were not providing you with independent science? Look, the House of Representatives tried to hold it down to something even more. Can you address that question, please? EPA concluded that Congress and regulated states have lost confidence in the full independence of EPA's advisory committees, and EPA decided that it would be appropriate to interject a bit more independence into the committees so that it would be beyond reproach. Remember, the very point of these committees is not to do EPA's work for it. It is to provide an outside, independent check on what EPA is doing. People should feel that this is a separate layer of scrutiny, and if everyone thinks that the committee is staffed with people who are going to take a hard look at what EPA is doing rather than be inclined to rubber stamp it, and I'm not saying that anyone, all the committee members who are excluded on this directive were qualified to serve and, I'm sure, served honorably. This is just a policy judgment made by this EPA that it's appropriate to put the committees even more beyond reproach than they were already. And so it's important to remember that these committees are about providing an outside, independent check that everyone can feel good about, and people who are financially contained over the agency. Counsel, I have a question about the record. And I've read the directive, and, you know, it excludes people who have received EPA grants, but then it says that that requirement doesn't apply to tribes or to state or local government agencies. We're told in one of the amicus briefs that the way the EPA has been working and has interpreted the directive, the exception to the exclusion does not apply to state universities, i.e., the ban applies to state universities. Is that accurate? And if so, where in the record is the source of that interpretation of the directive, and what other interpretations are there out there that we don't know about, because no record has been given? I think, actually, that goes to the fundamental lack of rightness in this case. Answer my question. You're over time already. Dr. Shepard was a state university employee who was asked to make a choice in this case. To date, my understanding is that yes. I asked about the interpretation of the directive as when it refers to state agency. There's nothing in the record about that. Is there any record? Where did this come from, this decision that state universities were to be treated differently than other aspects of state government? Do you know the answer? Yes, I know the answer. It's on the face of the directive. If you read the next priority, it says... Oh, it's a necessary reading of the directive? Yeah, if you read the next priority in the directive, which they did not challenge, it is EPA's goal to involve state government and tribal regulators, environmental regulators, to serve on committees, and so to the extent they're also getting grants, they're exempted from the first policy. So what does that have to do with whether universities are parts of states? Kansas State University, for example. There's nothing further expressly on that. All right. On the face of the directive. Remember, this is not something the agency even had to announce in the first place. Your time is up. Thank you. Thank you. Thank you, Your Honor. I want to start with our APA claim. Our view is basically the view expressed in the question by Judge Criotta. Under the APA, whatever else the EPA was required to do was to consider the effects of this directive on the expertise they need for these advisory committees. The only answer my friend gave for where that was considered was to cite these resolutions from the House that never passed the Senate. If that were enough to satisfy reasoned decision-making, it would be the end of judicial review because you just get a couple of your friendly party to pass in one house a resolution in sort of suggesting the course you want to pursue, and all of a sudden, rationality is off the table. Meanwhile, let's keep in mind, on the other side, the directive allows continued service by scientists affiliated with regulated industry, even on committees that directly affect the bottom line of their employers. We submit there's no sound justification, certainly not given in the directive, for that distinction. On the FACA claim, our core point goes back to the statute itself. In the question you asked, Judge Lynch, these are mandatory statutes that set forth criteria that agencies shall follow, including the requirement to fairly balance these committees with respect to the function they perform. And in looking at those statutes, I think the court should take as guideposts two cases. On the one hand, this court's decision in the NAACP case, which I think is fairly read, says that when you have a mandatory language like this, courts will bend over backwards to find a justiciable standard. I heard my friend on the other side almost, although not quite, concede that in extreme cases like the one I gave involving rules that require coal industry representation exclusively on air committees, that would be maybe justiciable, but that's a merits question. That's really what NAACP says, is that the extent these statutes are broad and implicate expertise, that may be a reason to give some deference to the agency, but it's not a reason not to review at all. The case on the other side you should look at is Webster v. Doe, which shows that when Congress wants to commit matters to agencies' exclusive judgment, it knows exactly how to do that. So the statute in that case said that the CIA director could terminate any employee that the director, quote, deemed advisable. And here Congress made a very different choice, used mandatory language, and we said that there's nothing impossible about enforcing the requirement that Congress imposed. So our claim, again, focuses on the failure to fairly balance with respect to the function performed. There's no difficulty identifying the function. We say best available science. I don't think EPA has really said that that's not the purpose or function of these committees. But whatever you think, the function is set forth either in the statutes that establish these committees or in the charters that identify their functions. Courts are perfectly capable of telling what those functions are. Then our claim is that the agency has failed to balance these committees fairly, and the EPA just reads that requirement out of the statute. Our claim is that the EPA has failed to fairly balance these committees because it's basically stacked the deck against independent, against academic and non-profit scientists who are disproportionately likely to have relevant expertise and be leaders in their field. And the question that that really implicates isn't any different than the analysis this court directed be undertaken in the NAACP case, where the court said, look, what you do in considering whether their HUD had administered its policies in a manner to affirmatively further the statutory purposes is you examine has the agency's administration furthered those purposes? If not, what's the explanation? Here, too, we just ask the court to examine whether the directive furthers or instead hinders the function to fairly balance these committees in light of the function they're supposed to perform. And we submit that as justiciable as in the NAACP case. Thank you.